**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

**CHRISTOPHER J. DANA,**                    )
                                            )
    **Plaintiff,**                      )
                                            )
**v.**                                      )      Civil Action No. __7:20CV300____
                                            )
**VIRGINIA POLYTECHNIC**                    )      <u>**TRIAL BY JURY DEMANDED**</u>
**INSTITUTE AND STATE**                     )
**UNIVERSITY,**                             )
                                            )
    **Serve: c/o Ms. Kay Heidbreder**   )
        **University Legal Counsel**    )
        **237 Burruss Hall (0121)**     )
        **Blacksburg, VA 24061**        )
                                            )
**TIMOTHY SANDS, PH.D in his official**      )
**capacity as President of Virginia**        )
**Polytechnic Institute and State**          )
**University,**                              )
                                            )
    **Serve: 314 Burruss Hall (0169)**  )
        **Blacksburg, VA 24061**        )
                                            )
**FRANK SHUSHOK, JR., PH.D, in his**         )
**individual capacity and official capacity**)
**as Vice President for Student Affairs of** )
**Virginia Polytechnic Institute and State** )
**University,**                              )
                                            )
    **Serve: 331 Airport Rd**           )
        **Blacksburg, VA 24060**        )
                                            )
**FRANCES B. KEENE, PH.D, in her**           )
**individual capacity and official capacity** )
**as Interim Assistant Vice President for**  )
**Student Affairs of Virginia Polytechnic**  )
**Institute and State University,**          )
                                            )
    **Serve: 401 Craig Dr**             )
        **Blacksburg, VA 24060**        )
                                            )
                                            )

1

STEVE SCHUH, in his individual )
capacity and official capacity Assistant )
Director of Student Conduct of Virginia )
Polytechnic Institute and State )
University, )
)
     Serve: 4290 Spicewood Ln )
         Salem, VA 24153 )
)
LIEUTENANT COLONEL DONALD G. )
RUSSELL, in his individual capacity and )
official capacity as Deputy Commandant )
of Cadets of the Corps of Cadets at )
Virginia Polytechnic Institute and State )
University, )
)
     Serve: 1125 Falcon Rd )
         Christiansburg, VA 24073 )
)
And )
)
MAJOR GENERAL RANDAL D. )
FULLHART, in his individual capacity )
and official capacity as Commandant of )
Cadets of the Corps of Cadets at Virginia )
Polytechnic Institute and State )
University, )
)
     Serve: 1230 Redbud Rd )
         Blacksburg, VA 24060 )
)
     Defendants. )

## COMPLAINT

COMES NOW the Plaintiff, Christopher J. Dana, and for this Complaint against the Defendants states as follows:

## INTRODUCTION

1.    Plaintiff Christopher J. Dana (hereinafter "Mr. Dana") files this Complaint against Defendants Virginia Polytechnic Institute and State University (hereinafter "Virginia Tech"), Timothy Sands, Ph.D, Frank Shushok, Jr., Ph.D, Frances B. Keene, Ph.D, Steve Schuh, Lt. Col.

Donald G. Russell, and Maj. Gen. Randal D. Fullhart for violations of his rights under the procedural and substantive due process requirements, as well as the equal protection clause, of the Fourteenth Amendment to the United States Constitution.

2.      On October 18, 2019, junior and senior leaders of the Bravo Company, a unit of the Virginia Tech Corps of Cadets, led an annual team-building event for Bravo Company's sophomore[1] members at Caldwell Fields campground (hereinafter the "2019 integration event"). In mild weather, they performed group exercise and hiked a mountain. They had a bonfire, spoke about Corps of Cadets tradition, and were awarded small pins for participating. The pins were placed on the sophomores' chests and lightly tapped, but no one was hurt, injured, had their blood drawn, or experienced pain as a result. The event had been a Corps of Cadets tradition for years, but was entirely optional. Afterwards, some of the cadets—sophomores, juniors, and seniors alike—shared a meal at a nearby Cook Out restaurant, while the rest simply went their separate ways.

3.      At the time of the 2019 integration event, Mr. Dana was a senior in the Corps of Cadets and a part of Bravo Company. Mr. Dana played no part in planning the event, though he had heard about the event, understood that the operations order for the event had been reviewed and approved at the battalion level, and recalled participating in similar events as a sophomore and junior himself.

4.      Shortly after the 2019 integration event, an anonymous student complained to Virginia Tech that the upperclassmen had engaged in hazing at the event. He alleged the event was conducted in "secret"; that students were told to record different destinations when they

---

[1]      There were some juniors among this group who participated because they had missed the prior year's integration event. However, the majority of participants were sophomores; accordingly, this group will be referred to as sophomores throughout this Complaint.

signed out of their residence halls to attend; and that the upperclassmen warned them "not to tell anyone." The clear (though inaccurate) implication of his complaint was that if the team-building event had to be done in "secret," then the upperclassmen must have known it was wrong to proceed, and did so anyways.

5.      Virginia Tech and the Corps of Cadets launched an investigation. Officials interviewed sophomores who participated. Not a single one corroborated the original complaint that it was done in secret. Not a single one corroborated that the alleged "blood pinning" actually involved pounding a pin into a cadet's chest with enough force to draw blood and cause injury. Not a single one stated that the pinning caused discomfort or pain. At the conclusion of its investigation, Virginia Tech and the Corps of Cadets accused Mr. Dana and his fellow upperclassmen of hazing and therefore violating university policy. Virginia Tech and the Corps of Cadets then scheduled a joint student conduct hearing to determine the truth of the allegations.

6.      One week before the joint student conduct hearing, Virginia Tech and the Corps of Cadets gave Mr. Dana and the other accused students a packet of documents purportedly containing all the information that the investigators had gathered, such as a formal notification of charges, investigation report, "conduct referral" addendums outlining the specific allegations against each cadet, and witness statements.

7.      Unbeknownst to the accused students, including Mr. Dana, Virginia Tech and the Corps of Cadets officials had removed from the packet any statements from the original accuser, and withheld any investigator notes, email, or other documents, from the accused students, referencing the original accuser or their complaint, in an effort to hide their identity. Stunningly, Virginia Tech officials had fabricated an email chain among themselves to make it seem like the complaint originated with a senior administrator on November 4, 2019, when in reality, the

student had made the original complaint to Ennis McCrery, Virginia Tech's Director of Student Conduct, on October 23, 2019. Thus, through this subterfuge, Virginia Tech intentionally misled Mr. Dana and the other accused students about how, when, and from whom the original complaint originated.

8.     On December 9, 2019, Virginia Tech and the Corps of Cadets held the joint hearing for the accused juniors and seniors of Bravo Company, including Mr. Dana, via hearing officers Steve Schuh (Virginia Tech) and Col. Donald G. Russell (Corps of Cadets). As described more fully below, the joint hearing was devoid of key due process safeguards. Most egregiously, Mr. Dana was accused at the joint hearing for the first time of "blood pinning" a cadet; neither the conduct referral addendum nor the cadet's witness statement had accused Mr. Dana of "blood pinning" the cadet, and thus Mr. Dana never had notice of this particular charge, which ended up being instrumental in the punishment Virginia Tech and the Corps of Cadets imposed upon Mr. Dana.

9.     On December 12, 2019, Virginia Tech and the Corps of Cadets found Mr. Dana and other accused juniors and seniors of Bravo Company guilty of hazing. Consequently, Mr. Dana was suspended through the end of the spring semester of 2020 from both Virginia Tech and the Corps of Cadets. Hearing officers specifically referenced in their written decision the allegation that the event was done covertly and in "secret," even though not a single student, except the anonymous accuser, made that accusation. Hearing officers specifically referenced that the alleged "blood pinning" would have caused a reasonable person discomfort or pain, even though not a single student, except the anonymous accuser, made that allegation. In other words, hearing officers relied on allegations from an unknown, anonymous person, to reach their decision, without allowing the accused students any opportunity to confront and question the

5

veracity of that allegation or any biases, conflicts of interest, or other relevant qualities belonging to the accuser.

10.     Mr. Dana had an Army scholarship and had signed a contract with the Army to commission as an officer upon graduation. However, unless he is afforded the relief requested by this action, Mr. Dana will be forever stigmatized, and his previously stellar record will be forever impaired, by the determination of guilt made by Virginia Tech and the Corps of Cadets via an unfair procedure devoid of basic due process guarantees. In addition, due to being found guilty of hazing and his subsequent suspension, Mr. Dana will be subjected to an Army hearing (which is currently pending), which may subject him to disenrollment, forfeiting his Army commission, and forcing him to repay his scholarship upon graduation.

11.     Therefore, Mr. Dana respectfully requests that this Court grant declaratory and injunctive relief setting aside the conduct hearing result as violative of the U.S. Constitution, as well as money damages to compensate his injuries and punish the flagrant wrongdoing of Virginia Tech, the Corps of Cadets, and their respective officers and administrators.

## **PARTIES**

12.     The Plaintiff, Mr. Dana, is, and at all times relevant to this Complaint has been, a resident of Virginia.

13.     Defendant Virginia Tech is a public university incorporated, and with its principal place of business located, in Virginia.

14.     Defendant Timothy Sands, Ph.D (hereinafter "Dr. Sands") is or was at all relevant times the President of Virginia Tech and resides in Virginia. Pursuant to Virginia Tech policy, the President of Virginia Tech is ultimately responsible for the discipline of all students at the university. At all relevant times, Dr. Sands was acting under color and authority of Virginia law.

15.     Defendant Frank Shushok, Jr., Ph.D (hereinafter "Dr. Shushok") is or was at all relevant times the Interim Vice President for Student Affairs for Virginia Tech[2] and resides in Virginia. Pursuant to Virginia Tech policy, administrative authority and responsibility for Student Conduct policies and procedures is delegated to the Vice President for Student Affairs. At all relevant times, Dr. Shushok was acting under color and authority of Virginia law.

16.     Defendant Frances B. Keene, Ph.D (hereinafter "Dr. Keene") is or was at all relevant times deputy to or assistant to Vice President for Student Affairs for Virginia Tech and resides in Virginia. At all relevant times, Dr. Keene was acting under color and authority of Virginia law.

17.     Defendant Steve Schuh (hereinafter "Mr. Schuh") is or was at all relevant times the Assistant Director of Student Conduct for Virginia Tech and resides in Virginia. At all relevant times, Mr. Schuh was acting under color and authority of Virginia law.

18.     Defendant Lieutenant Colonel Donald G. Russell (hereinafter "Col. Russell") is or was at all relevant times the Deputy Commandant of Cadets of the Corps of Cadets for Virginia Tech and resides in Virginia. Pursuant to the Virginia Tech Corps of Cadets Regulations, the Deputy Commandant of Cadets is a university official who serves at the pleasure of the President of the University, the Vice President for Student Affairs, and the Commandant of Cadets. At all relevant times, Col. Russell was acting under color and authority of Virginia law.

19.     Defendant Major General Randal D. Fullhart (hereinafter "Maj. Gen. Fullhart") is or was at all relevant times the Commandant of Cadets of the Corps of Cadets for Virginia Tech

---

[2]     In a November 4, 2019, email, Dr. Shushok identified himself as Senior Associate Vice President for Student Affairs. However, an official Virginia Tech news release states that Dr. Shushok "served as interim vice president since October 2019." *See* https://vtnews.vt.edu/articles/2020/03/shushok-vp-student-affairs.html. As of April 10, 2020, Dr. Shushok is Virginia Tech's Vice President for Student Affairs.

and resides in Virginia. Pursuant to the Virginia Tech Corps of Cadets Regulations, the Commandant of Cadets is a university official who serves at the pleasure of the President of the University and the Vice President for Student Affairs. At all relevant times, Maj. Gen. Fullhart was acting under color and authority of Virginia law.

## JURISDICTION AND VENUE

20.    This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331, and 1343.

21.    Venue is proper pursuant to 28 U.S.C. § 1391. Virginia Tech is a public university created under the Virginia Code, incorporated and with its principal place of business in Montgomery County, Virginia, which is a part of this judicial district. The acts, errors, and omissions giving rise to Plaintiff's claims took place in Montgomery County, Virginia, which is a part of this judicial district.

## FACTS

22.    Since its founding, Virginia Tech has offered military training to its students through the Virginia Tech Corps of Cadets (hereinafter "Corps of Cadets").

23.    Throughout its history, the Corps of Cadets has held voluntary team-building events to foster camaraderie among the members, thus referred to sometimes as "integration events."

24.    Such integration events, particularly those events organized by Bravo Company, have historically featured the custom of "blood pinning," whereby a newly earned award or "pin" is placed on a cadet's upper garment without clasps over the pins and hit by an

8

upperclassman or mentor as a culminating moment of achievement, resulting in drawn blood but no injuries.

25.     While "blood pinning" by definition requires the drawing of blood, as noted below, Defendants continuously and erroneously referred and continue to refer to the tapping of a pin onto the chest of a cadet, resulting in neither injury nor drawn blood, as "blood pinning."

26.     "Blood pinning" has been a longstanding military tradition, practiced throughout not only ROTC and Corps of Cadets organizations but all branches of the United States Armed Forces. In military schools, such as Airborne and Air Assault, it has been a trademark rite of passage during graduation often referred to as "Blood Wings."

27.     "Blood pinning," however, is a voluntary activity; those who choose not to be "blood pinned" suffer no repercussions for that choice.

28.     Mr. Dana is a young man with a promising future, which has unfortunately been marred by Defendants' actions to scapegoat him for his good faith efforts to honor the Corps of Cadets' traditions.

29.     Mr. Dana comes from a background emphasizing public service, including military service, and leadership. Thus, in high school, Mr. Dana enrolled and graduated from a JROTC program with an eye towards a career in military leadership. Then, when it came time for Mr. Dana to attend college, Mr. Dana enrolled in Virginia Tech and its Corps of Cadets.

30.     As a member of the Corps of Cadets, Mr. Dana was a contracted United States Army cadet with a three-year scholarship. Pursuant to that scholarship, the U.S. Army has contributed $38,273.50 towards Mr. Dana's education.

31.     As of this filing, Mr. Dana has completed all requirements for his commissioning except for one required Military Science class (which Mr. Dana would have taken during the

Spring 2020 semester if he had not been improperly suspended) and graduation, which was delayed as a result of his suspension by Defendants. Mr. Dana was assigned to the Field Artillery branch of the U.S. Army and was set to attend his basic officer leader course at Fort Sill, Oklahoma, after his graduation—but those plans have been derailed as a result of Defendants' actions.

32.     In 2019, Mr. Dana was a senior at Virginia Tech and a member of the Corps of Cadets, in his final year in the program. Mr. Dana was assigned to Bravo Company, a Corps of Cadets unit, as the Cadet Second Lieutenant and a platoon leader. Pursuant to his position, Mr. Dana's role included training, leading, and mentoring subordinate cadets.

### The Corps of Cadets Holds the 2019 Integration Event

33.     On October 18, 2019, the Bravo Company held a voluntary integration event for sophomore members of the company.

34.     The purpose of the team-building event, which had been held for years, was to foster camaraderie among the members.

35.     The 2019 integration event had been approved by Cadet Battalion Commander Nelson Demarest. Additionally, Commandant staff were aware of the event.

36.     The event was not secret; the operations order for the 2019 integration event was entitled "Bravo Company Sophomore Integration" and had been reviewed and approved at the battalion level. The operations order for the 2019 integration event also noted that cadets would receive their pins, the longstanding tradition of "blood pinning" being well known within the Corps of Cadets.

37.     The event was entirely voluntary. Anyone who was a member of Bravo Company before the event would continue to be so in good standing regardless of whether they participated in the event or not.

38.     Mr. Dana did not participate in the planning of the 2019 integration event, but had attended similar events in prior years as a sophomore and junior.

39.     Mr. Dana did not draft or assist in drafting the operations order that was presented to approve the event.

40.     Mr. Dana was simply informed of the date, time, and location of the event, on the day before the event, and he showed up.

41.     During the 2019 integration event, a group of about 21 juniors and seniors in the Corps of Cadets attended the event, and about 20 sophomores in the Corps of Cadets voluntarily participated.

42.     Participants met at Caldwell Fields to perform a variety of exercises for physical training.

43.     Then, the group undertook a hike, stopping at various points.

44.     At the conclusion of the hike, the group went back down and had a bonfire where one of the platoon leaders gave a speech about Bravo Company.

45.     Then, a ceremony was held where the members were given their pins to recognize their participation.

46.     Upon information and belief, each sophomore brought their own pin, which was a small company pin.

47.     The pins, which had been sterilized with rubbing alcohol, were then lightly tapped onto the sophomores' chest to conclude the ceremony.

48.     No sophomores who were pinned appeared to suffer or stated that they suffered any injury, pain, or having their blood drawn. The pinning would not have caused a reasonable person pain or discomfort.

49.     As with all aspects of the 2019 integration event, participation in the pin ceremony was entirely voluntary; no one was pinned who did not want to be, and no negative consequences attached to anyone who did not agree to be pinned. Indeed, as Virginia Tech's own investigation revealed, several sophomores declined to be pinned, and were in no way retaliated against, belittled, or made to feel any less a member of the Corps of Cadets or Bravo Company.

50.     Following the 2019 integration event, most of the Corps of Cadets members— sophomores, juniors, and seniors alike— took pictures together, shared congratulatory remarks, and in some cases went out to eat at a nearby "Cook Out" restaurant.

51.     Absolutely no drugs or alcohol were involved in the 2019 integration event.

52.     The 2019 integration event was much like it had been for many years prior; if anything, it was less physically intensive than in prior years.

53.     Mr. Dana's participation in the 2019 integration event was limited and minimal.

54.     Mr. Dana arrived at Caldwell Fields, per the details of the email he had received the day prior.

55.     Since Mr. Dana was not involved in planning the 2019 integration event, he asked leaders of the event what he could do to help. Mr. Dana was told he could hang out in another cadet's vehicle.

56.     Throughout much of the event, Mr. Dana sat in the passenger seat of the vehicle, talking with friends via Snapchat. It was during this time that many of the alleged acts of the 2019 integration event, such as "Bravo Baths," the designation given to that part of the 2019

12

integration event involving the cadets' performance of physical exercises in ankle-deep water, took place.

57.     When the cadets began to run up a hill during the hike, Mr. Dana felt awkward sitting in the vehicle as others were running.

58.     Thus, Mr. Dana exited the vehicle and ran alongside the formation, hanging at the rear to keep an eye out for any stragglers to provide them encouragement.

59.     Mr. Dana specifically provided encouragement to Cadets, as detailed in the witness statements they provided to Virginia Tech and the Corps of Cadets.

60.     Throughout the 2019 integration event, Mr. Dana made no comments of a degrading nature to any cadet. Rather, as noted above, Mr. Dana provided encouragement and support, consistent with his position as Cadet Second Lieutenant and a platoon leader.

61.     During Mr. Dana's time at Virginia Tech, students in the Corps of Cadets routinely performed grueling events involving physical training throughout the year, which is typical for military units.

62.     It did not appear to Mr. Dana that any of the physical activity being undertaken by the cadets during the 2019 integration event was more severe than physical activity members of the Corps of Cadets regularly engaged in.

63.     After the speech at the bonfire (*see* ¶ 44), a cadet named Justin Ratcliffe (hereinafter "Mr. Ratcliffe") motioned towards Mr. Dana and Mr. Dana responded by asking whether Mr. Ratcliffe had been pinned and if he would like Mr. Dana to pin him.

64.     Mr. Ratcliffe answered in the affirmative and, adhering to Mr. Ratcliffe's wishes, Mr. Dana lightly tapped the pin onto Mr. Ratcliffe, which did not hurt Mr. Ratcliffe, did not cause Mr. Ratcliffe any pain or discomfort, and did not draw any of Mr. Ratcliffe's blood.

65.     By Mr. Dana's observation, neither Mr. Ratcliffe nor any other cadet were injured during the event, and no cadet told Mr. Dana otherwise. No cadet reported experiencing any discomfort, injury, or pain during the pinning ceremony.

66.     By Mr. Dana's observation, all cadets participating seemed to be in good spirits and motivated, and not demeaned, degraded, or humiliated, and no cadet told Mr. Dana otherwise.

67.     After the event, Mr. Dana returned to his girlfriend's apartment.

68.     At all times during the 2019 integration event, it was Mr. Dana's understanding that the event had been passed up the chain of command and approved at all levels.

69.     Mr. Dana had no reason to think that the 2019 integration was not approved, because Mr. Dana had participated in prior integration events, including during his sophomore year, where he was similarly pinned.

70.     Moreover, throughout his time in the Corps of Cadets, Mr. Dana had been required to engage in physical activities just as—if not more—rigorous than the physical activities he observed during the 2019 integration event.

71.     Mr. Dana participated in the Platoon Tactical Challenge, in which cadets conduct physical fitness, negotiate obstacles, ford a river, and crawl through mud pits. The Platoon Tactical Challenge would take place each March, in cold weather.

72.     Another similar physically challenging event that takes place each year is the Caldwell I March, which Mr. Dana also participated in. In that event, freshmen, cadet cadre, and Corps of Cadets staff march approximately thirteen miles as part of school tradition to honor William Addison Caldwell, the first student and cadet at Virginia Tech. Later in the year, a second thirteen-mile march, Caldwell II, takes place, and culminates in a turning ceremony

14

where each upper classmen, of which there are typically approximately 750, punches the fist of each freshmen cadet. Some senior cadets are known to wear their class rings on their punching hand. Cadets commonly leave with blood on their knuckles due to the repetitive hits to the hand.

73.     Corps of Cadets leadership organize, run, and participate in the Platoon Tactical Challenge and the Caldwell marches, among other similar activities.

74.     Virginia Tech staff and Corps of Cadets leadership were aware of the events and allowed them to go forward.

75.     The Corps of Cadets also displayed a framed photograph in its hall of a prior year integration event where team members had been pinned, according to Corps of Cadets tradition. This photograph remained on display on campus when the 2019 integration event took place.

76.     Integration events such as 2019 integration event have been referenced and described in *The Bugle*, the official yearbook of Virginia Tech, throughout the many years of its publication. Such references and descriptions included identification of "Bravo Baths" as part of integration events.

77.     Notwithstanding Corps of Cadets' history and tradition, following the 2019 integration event, an unidentified student contacted Virginia Tech to allege the event constituted hazing and that Bravo Company's juniors and seniors acted covertly to avoid oversight.

78.     As a result of the anonymous complaint, Virginia Tech and the Corps of Cadets launched an investigation into whether Mr. Dana, and others, had violated Virginia Tech's and the Corps of Cadets' hazing policies.

**Virginia Tech and the Corps of Cadets "Investigate" the 2019 Integration Event**

79.     On October 23, 2019, Ennis McCrery (hereinafter "Ms. McCrery"), Director of Student Conduct at Virginia Tech, spoke with an anonymous student about the 2019 integration event. Ms. McCrery took notes during the meeting.

80.     On that same day, Ms. McCrery emailed Dr. Shushok and Dr. Keene regarding the meeting.

81.     In her email, Ms. McCrery reported that the anonymous cadet asserted that the 2019 integration event was a secret initiation; that it was not sanctioned by the Corps of Cadets; that sophomores were threatened not to tell anyone about the event; that the event involved "extremely intense physical activity"; and that the leaders of the 2019 integration event required sophomores to falsely claim that they went to an obstacle course.

82.     Approximately one week later, on November 1, 2019, Ms. McCrery emailed Dr. Shushok and Dr. Keene again, indicating that she had spoken again with the complainant regarding the 2019 integration event. She provided her notes, containing a more detailed—though, by her own admission, generic—summary of the event and asked to discuss approaching Maj. Gen. Fullhart, Commandant of the Corps of Cadets, about the situation. *See* **Exhibit A.**

83.     The notes purporting to contain the anonymous complainant's statements, *see* **Exhibit A**, contained a number of inconsistences with subsequent witness statements and the findings of Virginia Tech's and the Corps of Cadets' investigation, including the following:

> a.  The anonymous complainant asserted that the 2019 integration was not sanctioned by Corps of Cadets' leadership, despite the fact that the Bravo Company leadership, including Mr. Dana, believed it was so sanctioned;

b.   The anonymous complainant asserted that Bravo Company leadership talked about a prior event involving Foxtrot Company's integration event in 2018, which resulted in sanctions against that company of the Corps of Cadets (see ¶¶ 201–205), a detail which went unmentioned by all other witnesses;

c.   The anonymous complainant asserted that the cadets were made to wear weighted vests, a detail which went unmentioned by all other witnesses;

d.   The anonymous complainant asserted that the water Bravo Company performed physical exercise in was not cold, but other witnesses alleged that it was cold;

e.   The anonymous complainant asserted that blood pinning occurred, but defined blood pinning as "upperclassmen pound[ing] a company pin into a sophomore's chest," and thus provided a false definition as it did not include any mention of bleeding, and, moreover, mischaracterized the light tapping of pins as "pounding"; and

f.   The anonymous complainant asserted that, after the 2019 integration event, everyone returned to campus, despite the fact that after the event, the cadets simply went their separate ways, with some sharing a meal at a nearby Cook Out restaurant.

84.   On November 3, 2019, Dr. Shushok emailed Ms. McCrery and Dr. Keene and suggested that they "pair[] [Ms. McCrery's] narrative down a lot and only share[]" a sanitized version of the complaint that Dr. Shushok had typed up himself. *See* **Exhibit B.**

85.   Dr. Shushok suggested that Dr. Keene then "write an e-mail to me indicating receipt of the complaint [that Dr. Shushok typed]" that he could then send to Maj. Gen. Fullhart so that it "doesn't expose that it is coming from a particular student." *See* **Exhibit B.**

17

86.    When Dr. Shushok suggested to Ms. McCrery they keep the student's identity anonymous, and that Dr. Keene fabricate an email to obfuscate the source and full scope of the student's accusations, he knew, or should have known, that the Virginia Tech and Corps of Cadets policies provide, and that the Fourteenth Amendment to the United States Constitution guarantees, that students like Mr. Dana have a right to know and cross-examine their accuser in misconduct matters.

87.    Dr. Shushok knew, or should have known, that he was intentionally disregarding Mr. Dana's rights as a student accused of misconduct, when he went to great lengths to re-package the original student's complaint and fabricated an email chain to hide its source.

88.    Pursuant to Dr. Shushok's suggestion, on November 4, 2019, Dr. Keene emailed Dr. Shushok, indicating that she had "received a complaint" and providing the sanitized version of the complaint that Dr. Shushok had drafted, omitting any reference to the original accuser, the full details of his accusations, or even that a student had made the complaint. *See* **Exhibit C.**

89.    Dr. Keene's email to Dr. Shushok contained a number of false, misleading, and/or disingenuous statements, such as that she had "received a complaint" and that [g]iven the severity of what [she] learned, [she] wanted to bring it to [Dr. Shushok's] attention," in conformance with Dr. Shushok's suggestion of obfuscating the origins of the allegations regarding the 2019 integration event. *See* **Exhibit C.**

90.    Approximately one hour later, Dr. Shushok forwarded Dr. Keene's contrived email to Maj. Gen. Fullhart; Ms. McCrery was included on the forwarded email as well. The stated purpose of forwarding the email was to initiate an investigation into whether the October 18, 2019, event constituted hazing.

91.     Virginia Tech and the Corps of Cadets assigned Colonel Craig T. Alia (hereinafter "Col. Alia"), Deputy Commandant of the Corps of Cadets, and Ms. McCrery to investigate the hazing allegations regarding the 2019 integration event.

92.     Neither Col. Alia nor Ms. McCrery should have been assigned to investigate the hazing allegations due to their conflicts of interest and/or bias.

93.     Col. Alia's conflicts of interest were evident. He was one of two faculty in charge of the cadets of Bravo Company. He was the senior faculty member that Mr. Dana, and other cadets, could and would turn to for counsel or approval of liberties. As the charged cadets were under his authority, Col. Alia held a higher degree of influence over the cadets than any other faculty member on campus.

94.     In addition, Col. Alia had a conflict of interest specifically related to the 2019 integration event because he was a witness to the 2019 integration event.

95.     As Deputy Commandant, one of Col. Alia's duties was to sign-off on operations orders that students drafted in advance of their team-building events.

96.     One of the contested matters regarding the 2019 integration event was whether the event was sanctioned, *i.e.*, whether the event's operations order had been approved.

97.     Col. Alia would later claim that he never saw or approved the operations order for the 2019 integration event, supporting the contested claim that the event was done in secret or unsanctioned.

98.     Notwithstanding Col. Alia's interest in the case as a witness, Virginia Tech and the Corps of Cadets allowed him to serve a dual role as the investigator into what transpired.

99.     Col. Alia was likewise biased, because any admission that he was aware of or had approved or sanctioned the 2019 integration event may have resulted in discipline against him by Virginia Tech or the Corps of Cadets.

100.    Furthermore, it was improper for any person from the Corps of Cadets leadership, including Col. Alia, to investigate the allegations surrounding the 2019 integration event, as the allegations, if true, would have implicated the Corps of Cadets itself, as an organization.

101.    Ms. McCrery had a conflict of interest because she was the one to whom the anonymous complainant had first made allegations regarding the 2019 integration event, a fact which Dr. Shushok and Dr. Keene conspired to obscure.

102.    Ms. McCrery had in fact taken statements from the anonymous complainant on at least two separate occasions prior to being placed in charge of Virginia Tech's investigation into the 2019 integration event, a fact omitted from the report that was ultimately compiled by Ms. McCrery and Col. Alia.

103.    Ms. McCrery's resulting bias was evident, as in an email to Dr. Shushok and Dr. Keene, Ms. McCrery opined that the anonymous complainant "did the right thing" and that they were "pretty special . . . with a strong moral compass." Ms. McCrery further stated that she "admire[d]" them and expressed a desire to give them "the Courageous Leadership award." ***See*** **Exhibit D.**

104.    Ms. McCrery's email exalting the anonymous complainant was sent on November 6, 2019, despite the fact that the official investigation began on November 4, 2019, and the final report was not submitted until November 18, 2019. Nevertheless, Ms. McCrery had obviously made up her mind regarding the veracity of the anonymous complainant's allegations.

105.    On November 4, 2019, Col. Alia ordered all Bravo Company sophomores and various Bravo Company leaders, including Mr. Dana, to report for a mandatory meeting.

106.    Sophomores were taken to a separate room, where they were instructed to make statements about what happened, and if they refused, they would face punishment. The sophomores were not interviewed by Ms. McCrery and Col. Alia, however, but by subordinate investigators assigned by Ms. McCrery and Col. Alia.

107.    Each sophomore present wrote a written statement.

108.    Not a single sophomore said Mr. Dana engaged in an act of hazing.

109.    Sophomores' witness statements emphasized that the 2019 integration was optional (and that being pinned was likewise optional) and were, overall, positive in tone. These statements included language such as:

   a.   "We began doing some light PT";

   b.   "We had the option to get blood pinned";

   c.   "After that we went to Cook-Out";

   d.   "They stated [pinning] was optional";

   e.   "There were cars and flashlights to see";

   f.   "It was made clear . . . if we did not want to participate, we did not have to";

   g.   "Bravo initiation was <u>not</u> mandatory, neither was the blood pinning. Leadership made that clear";

   h.   "I personally enjoyed the event";

   i.   "I do not find it appropriate to describe the event as hazing";

   j.   "I was not bloodpinned because I refused";

   k.   "It was made VERY CLEAR that the entire event was optional"; and

21

l. "[M]ultiple announcements were made that this event was completely voluntary and if you did not participate, there would be no consequences."

110. Not a single cadet corroborated the anonymous complaint suggesting that the event was conducted in "secret" or "unsanctioned." Not a single cadet corroborated the allegation that blood pinning involved pounding the pin into a cadet's chest to draw blood and/or cause injury.

111. Ms. McCrery and Col. Alia spoke with platoon leaders. However, they did so collectively, and did not interview the platoon leaders, including Mr. Dana, individually.

112. On the night of November 4, 2019, Col. Alia stated by email to Maj. Gen. Fullhart that the investigation interviews were complete.

113. In an apparent rush to judgment, Col. Alia stated that he and Ms. McCrery had a "full understanding" of what happened at the 2019 integration event, despite admitting to not having gone over all of the witness statements, and despite not obtaining individual accounts from the platoon leaders, including Mr. Dana. *See* **Exhibit E.**

114. Further, Col. Alia described the details as "imprecise" but corroborating the allegations of the anonymous complaint. *See* **Exhibit E.** However, this was not the case (see ¶¶ 83(a)–(e)).

115. On November 5, 2019—before Virginia Tech or the Corps of Cadets held any sort of hearing—Col. Alia moved all cadets alleged to have participated in the 2019 integration event, including Mr. Dana, out of leadership positions, despite offering ostensible assurances that there would be no rush to judgment. In so doing, it appears Col. Alia attempted to distance himself from the allegations surrounding Bravo Company.

116.    By November 6, 2019, Col. Alia and Ms. McCrery determined who would be charged, making a critical distinction between those accused of "blood pinning" and those not.

117.    By November 12, 2019, Col. Alia further categorized the participants as either leaders, those who had pinned, and those who had otherwise participated.

118.    Between November 4, 2019, and November 18, 2019, Col. Alia and Ms. McCrery exchanged a number of emails discussing the findings of their investigation, who would be charged, and other matters related to the 2019 integration event. On many of these emails, Maj. Gen. Fullhart was copied.

119.    On November 18, 2019, Ms. McCrery and Col. Alia finished and submitted their investigation report.

120.    The investigation report contained a number of inaccuracies.

121.    Critically, the report asserted that "platoon leaders and platoon sergeants all stated that they believed the event was approved by the Corps of Cadets leadership" but that "they knew that the 'Bravo Bath'[3] and blood pinning would not have been approved by Corps of Cadets leadership."

122.    Mr. Dana, however, only stated that he would not have participated in the 2019 integration event had he known that the 2019 integration event was not approved by Corps of Cadets leadership.

123.    Mr. Dana was not, in fact, aware that any aspect of the 2019 integration event had not been approved by Corps of Cadets leadership.

---

3        As noted above, *see* ¶ 56, "Bravo Baths" was the designation given to that part of the 2019 integration event involving the cadets' performance of physical exercises in ankle-deep water.

124.    Furthermore, the operations order for the 2019 integration event noted that cadets would receive their pins. The longstanding tradition of "blood pinning" was well known within the Corps of Cadets, as were "Bravo Baths" and other physical exercises performed during integration events.

125.    The investigation report also failed to fully acknowledge that findings of the investigation that were inconsistent with the anonymous complainant's allegations, such as the allegations cadets were made to wear weighted vests; that Bravo Company leadership talked about a prior event involving Foxtrot Company's integration event in 2018; that, after the 2019 integration event, everyone returned to campus; and that the water was not cold.

126.    On November 20, 2019—before Virginia Tech held any sort of hearing—Col. Alia indicated that Ms. McCrery had stated "that all punishments from student affairs would not go into effect until next semester," statements indicating that Virginia Tech had already determined that the punishment would include suspension and other serious sanctions.

127.    On November 25, 2019, Ms. McCrery sent Mr. Dana a letter advising that he had been charged with violations of university policy involving hazing.

128.    The November 25, 2019, letter informed Mr. Dana: "In determining whether a specific behavior violates the hazing policy, consideration will be given to how the behavior relates to the university's mission and purpose. Please refer to the Hazing Section in the Hokie Handbook for additional information."

129.    The *Hokie Handbook*, 2019-2020 (hereinafter "Hokie Handbook")[4] defines hazing as "any mental or physical requirement, request, or obligation placed upon any person which could cause discomfort, pain, fright, disgrace, or injury, is personally degrading or violates any federal, state, local statute, or university policy, the willingness of an individual to participate in such activity notwithstanding."

130.    The Hokie Handbook incorporated by reference the *Virginia Tech Corps of Cadets Regulations*, July 2019 (hereinafter "Corps of Cadets Manual").[5]

131.    Annex B of the Corps of Cadets Manual described specific acts that constitute hazing. Directing any cadet in a cadet training status to enter a body of water was specifically defined as hazing. Pinning a cadet, whether blood is drawn or otherwise, is not defined as hazing, nor mentioned anywhere in the Hokie Handbook or Corps of Cadets Manual.

132.    On December 2, 2019, Ms. McCrery and Col. Alia met with Mr. Dana, and the other accused students, for a prehearing meeting.

133.    Ms. McCrery and Col. Alia gave the accused students a packet of documents but withheld any meeting notes with the anonymous complainant as well as any email, documents, or other items of evidence that the anonymous complainant submitted to initiate the investigation.

---

[4]     The Hokie Handbook is publicly available at https://www.hokiehandbook.vt.edu/content/dam/hokiehandbook_vt_edu/assets/doc/HokieHandbook2019-20.pdf and is incorporated into this Complaint by reference.

[5]     The Corps of Cadets Manual is publicly available at https://vtcc.vt.edu/content/dam/vtcc_vt_edu/resources/manuals/regulations.pdf and is incorporated into this Complaint by reference.

134.    The packet contained the final investigation report submitted by Col. Alia and Ms. McCrery, which the cadets, including Mr. Dana, saw for the first time—two weeks after it had been completed.

135.    The final investigation report stated:

On November 4, 2019, Interim Vice President of Student Affairs Dr. Frank Shushok received a report from Interim Assistant Vice President of Student Affairs Dr. Frances Keene alleging that students in Bravo Company held a secret, unsanctioned 'sophomore integration event' on or about October 18, 2019. Specifically, the report states the following:

*Around 6:00 p.m., Bravo Company departed by car to the event and were warned not to tell anyone. Sophomores were instructed not to write "integration" when they signed out and to record different destinations so as not to draw attention to the fact that a large group was leaving together.*

*As part of the "integration" (lasting around 4 hours) cadets went to Caldwell Fields where they:*
*1) were required to do pushups and sit ups in the parking lot*
*2) led in "rat line" to a creek to take "Bravo Baths" in the creek*
*3) Alternated bear crawls, crab walks, and other exercises back to the parking lot*
*4) Climbed a mountain and were instructed to bear crawl, crab walk, with pushups in between*
*5) Given weighted vests and instructed to run up and down for several miles*
*6) "Blood pinned" by upperclassmen (i.e., upperclassmen pounded a company pin into a sophomore's chest)*

Dr. Shushok referred this report to Major General Randy Fullhart, Commandant of the Corps of Cadets, and Ennis McCrery, Director of Student Conduct, for a joint investigation.

136.    As written, the final report gave the impression that the italicized text directly quoted the original accuser. As noted above, it did not. Rather, Dr. Shushok drafted that section on November 3, 2019, based secondhand on Ms. McCrery's generic notes from her meeting with the original complainant, who had first talked with Ms. McCrery on October 23, 2019. Dr.

Shushok then sent it to Dr. Keene, to send back to him on November 4, 2019, to "start" the investigation.

137. The final report misled the accused students and the hearing officers who presided over the case on December 9, 2019 into believing that the complainant had been directly quoted in the italics and reported the allegation on November 4, 2019; this information was false. The final report further misled the accused students and the hearing officers who presided over the case on December 9, 2019 into believing that an unbiased, fair, thorough investigation had been conducted; this information was false.

138. Virginia Tech knowingly misled its own students and hearing officers about the true source, substance, and nature of the hazing complaint, in the final report to the parties. Virginia Tech further misled its own students and hearing officers regarding the underlying motivations of the investigators, the lack of impartiality on the part of the investigators, the rushed, inadequate investigation, the failure of the investigators to explore the discrepancies between the statement of the complainant and the statements of the sophomores, and the predispositions of the investigators to hold the cadets responsible and impose harsh sanctions in order to send a clear message to the community regarding Virginia Tech's ostensible intolerance of hazing.

139. The packet contained an addendum outlining the specific charges against each cadet. With respect to Mr. Dana, the addendum stated only: "Christopher Dana is a senior member of the Corps of Cadets and serves as a platoon leader for Bravo Company. He is reported to have been present at the integration event and to have served a leadership role that night. Based on this information, Mr. Dana may have violated University and Corps of Cadets policies." *See* **Exhibit F.**

140.    The addendum pertaining to Mr. Dana contained no allegations related to "blood pinning," whereas "blood pinning" was identified in the addendums pertaining to other charged cadets.

141.    The packet also contained written statements and an official notification that the joint student conduct hearing was set for December 9, 2019, at 8:00 a.m.

142.    Mr. Dana thus had less than a week to prepare a defense to the serious yet vague and generalized charges against him.

143.    The joint student conduct hearing set for December 9, 2019, also coincided with end of semester activities, such as exams and deadlines for reports, as classes ended on December 11, 2019, and final exams were administered between December 13 and December 18, 2019.

144.    In light of these facts, one of the charged cadets, Platoon Sergeant Rupkey, requested a continuance for the hearing.

145.    The requested continuance was denied.

146.    Ultimately, the joint investigation by Virginia Tech and the Corps of Cadets failed to proceed in accordance with university policy, as outlined in the Hokie Handbook and the Corps of Cadets Manual; the joint investigation likewise failed to proceed in a manner consistent with the due process and equal protection guarantees of the Fourteenth Amendment to the United States Constitution.

147.    The Hokie Handbook incorporated by reference the Corps of Cadets Manual and set forth the procedure for alleged violations by cadets of university policies:

> *Alleged conduct violations by cadets of university policies and/or Corps of Cadets regulations are adjudicated either by the Cadet Executive Committee or a Deputy Commandant hearing.*

28

> *. . . Cadet regulations stipulate the detailed process of adjudicating*
> *alleged cadet misconduct.*

148.    The applicable "cadet regulations" referenced in the Hokie Handbook are set forth

under a section entitled "rights of the accused" in the Corps of Cadets Manual, including:

> *2. Be informed of the identity of the accuser(s) or the*
> *circumstances leading to the hearing*
> *. . .*
> *8. Cross-examine witnesses who are provided for in accordance*
> *with this regulation*
> *. . .*
> *10. Have evidence, including documents or physical evidence,*
> *within the control of Corps of Cadets or University authorities*
> *produced in accordance with this regulation*

149.    Consistent with these rights, on November 4, 2019, Mr. Dana signed a document

provided to him by Virginia Tech, labeled "Accused Rights," which stated in part:

> *. . .*
> *2. You shall be informed of the identity of the accuser(s) or the*
> *circumstances leading to the hearing.*
> *3. You shall be informed of witnesses and provided copies of any*
> *statements or other evidence used against you.*

150.    As set forth below, Virginia Tech and the Corps of Cadets failed to uphold Mr.

Dana's rights as set forth in its own policies.

151.    Virginia Tech and the Corps of Cadets failed to inform Mr. Dana of the identity of

his accuser.

152.    Virginia Tech and the Corps of Cadets failed to inform Mr. Dana of the

circumstances leading to the hearing.

153.    Virginia Tech and the Corps of Cadets failed to allow Mr. Dana the opportunity to

cross-examine his accuser.

154.    Virginia Tech and the Corps of Cadets failed to give Mr. Dana all documents and

evidence within its control prior to the hearing.

**Virginia Tech and the Corps of Cadets Hold a Joint Student Conduct Hearing**

155.    On December 9, 2019, Mr. Dana and the other accused students appeared for a joint hearing, administered by Virginia Tech and the Corps of Cadets, to determine whether they had violated the hazing policy.

156.    On the eve of the hearing, Col. Alia contacted one of the accused students by email and advised him how to plead the next day. He said to accept responsibility, stay focused on the "big picture," and "we can work around anything else."

157.    Col. Alia did not refer the student to an independent advisor for advice on how to plead the next day at the hearing.

158.    The hearing officers consisted of two Virginia Tech staff: one from the Corps of Cadets, and the other from the Office of Student Conduct.

159.    The hearing officer from the Office of Student Conduct was Mr. Schuh, Assistant Director of Student Conduct for Virginia Tech.

160.    The hearing officer from the Corps of Cadets was Col. Russell, the Deputy Commandant of Cadets of the Corps of Cadets for Virginia Tech.

161.    Col. Russell, however, was not a neutral decisionmaker, as he had an interest in finding individuals such as Mr. Dana responsible for the 2019 integration event as opposed to the Corps of Cadets as an organization.

162.    The hearing officers advised that the students had the right to plead responsible, not responsible, or no plea, to the charges. A pre-hearing communication from Virginia Tech informed the students, including Mr. Dana, that their plea had no bearing on the outcome of the hearing.

163.    The accused students, including Mr. Dana, entered their pleas; Mr. Dana entered a plea of not responsible.

164.    After entering pleas, the hearing officers heard opening statements from the accused students.

165.    Next, the hearing officers reviewed the contents of the investigator's report and the various written statements from the sophomores who were present at the event.

166.    The hearing officers then heard testimony from the accused students, including Mr. Dana.

167.    The hearing officers did not hear testimony from anyone identified as the original accuser because, as noted above, they were never identified.

168.    During the hearing Ms. McCrery falsely stated that "this began on November 4, 2019," when Dr. Shushok contacted her. In truth, Ms. McCrery was approached by the original, anonymous complainant on October 23, 2019, a fact which, at a minimum, Dr. Shushok and Dr. Keene were aware of. Yet, Ms. McCrery's false statement was apparently accepted, and Ms. McCrery was never reprimanded for making a false statement during a formal hearing.

169.    During the hearing, Mr. Ratcliffe was called as a witness.

170.    Mr. Dana was never informed that Mr. Ratcliffe would be testifying at the hearing.

171.    Col. Russell unexpectedly elicited testimony from Mr. Ratcliffe that Mr. Dana had "blood pinned" Mr. Ratcliffe.

172.    Mr. Dana was unprepared for this surprise testimony, as Mr. Ratcliffe's witness statement did not allege that Mr. Dana had "blood pinned" him, and the addendum to the

investigation report outlining the specific allegations against Mr. Dana made no mention whatsoever of Mr. Dana having "blood pinned" any person.

173.    Therefore, Mr. Dana was not informed of this allegation prior to the hearing itself and was unable to prepare any defense to it or cross-examine Mr. Ratcliffe due to the shock of this surprise testimony.

174.    During a break in the hearing, Col. Alia suggested to one of the cadets to change his plea to responsible. Col. Alia, however, did not offer this advice to Mr. Dana or, upon information and belief, any other cadet.

175.    Following the hearing, on December 12, 2019, Mr. Dana and others were found responsible for violating the Virginia Tech's hazing policy. *See* **Exhibit G.**

176.    The letter Mr. Dana received on December 12, 2019, containing the outcome of the hearing, defined blood pinning as "putting a pin onto an individual's chest and then physically hitting or pushing the exposed pins into the individual's skin to the point of drawing blood," and found Mr. Dana guilty of "blood pinning."

177.    However, no sophomore in Bravo Company who was pinned stated that blood was drawn as a result, nor reported that they felt any pain or were injured from the pinning.

178.    Even Maj. Gen. Fullhart admitted that no sophomore in Bravo Company who was pinned was injured from the pinning. *See* **Exhibit H.**

179.    None of the sophomores who were interviewed suggested that the event was hazing; no one was hurt, injured, or endangered; the event itself was a Corps of Cadets tradition; and, there was no evidence, other than from the anonymous accuser, that the event was held in secret to evade detection from university authorities.

180.    Therefore, the evidence did not support a finding of hazing.

181.     Furthermore, due to Mr. Dana's not being informed of Mr. Ratcliffe's "blood pinning" allegation against him, Mr. Dana was unable to elicit testimony from Mr. Ratcliffe regarding whether Mr. Ratcliffe's blood was drawn or whether Mr. Ratcliffe felt any pain or was injured from the pinning. Upon information and belief, Mr. Ratcliffe would have testified to both inquires in the negative, which would have cemented the fact that Mr. Dana was not responsible for hazing per Virginia Tech's own definition of "blood pinning."

182.     The letter Mr. Dana received on December 12, 2019, containing the outcome of the hearing, also referenced the "Bravo Baths" incident, *i.e.*, "physical training in a cold creek on a cold night." Mr. Dana, however, neither participated nor was even present at the "Bravo Baths" incident.

183.     As punishment for the finding of responsibility, Virginia Tech suspended Mr. Dana for one semester, and Mr. Dana was dismissed from the Corps of Cadets and barred from re-enrolling for one semester.

184.     Mr. Dana was not punished with a deferred suspension, as other cadets were, specifically because he was found to have "blood pinned" a cadet.

185.     The student whom Col. Alia advised to accept responsibility prior to the hearing (see ¶ 156) received a lesser sanction, even though he was found guilty of having "blood pinned" a cadet, specifically because of his "acceptance of responsibility and reflection," despite the fact that Mr. Dana and the other accused students were assured that their plea would have no bearing on the outcome.

186.     Mr. Dana, as well as the other accused students, were advised that they had a right to appeal on the following grounds: (1) denial of procedural guarantees; (2) significant and

relevant new evidence that was not available at the time of the hearing; and (3) sanctions/findings that are unduly harsh or arbitrary.

**Mr. Dana Appeals the Outcome of the Student Conduct Hearing**

187.    Pursuant to his rights, Mr. Dana appealed the hearing outcome to both Virginia Tech and the Corps of Cadets.

188.    Dr. Keene presided over the appeal for Virginia Tech; she was appointed by Dr. Shushok, who held administrative authority and responsibility for Student Conduct policies and procedures, in order to "expedite" the appeals.

189.    Dr. Keene, however, was not a neutral decisionmaker, as she had biases and a conflict of interest.

190.    Specifically, Dr. Keene was involved in the investigation of the 2019 integration event from the beginning, and even conspired with Dr. Shushok to create a false narrative regarding the origination of the complaint.

191.    Further, Dr. Keene was regularly updated by Col Alia and Ms. McCrery—who, as noted above, had conflicts of interest and were biased themselves (see ¶¶ 92–104)—on the investigation, likely causing Dr. Keene to form pre-conceived notions regarding the allegations against Mr. Dana, among others.

192.    In addition, Dr. Shushok, who appointed Dr. Keene and was ultimately responsible for Student Conduct policies and procedures, had a clear bias in favor of the anonymous complaint and against the other cadets in the Corps of Cadets, including Mr. Dana. In an email dated November 7, 2019, to the anonymous complainant, Dr. Shushok noted that he "admire[d] and respect[ed]" the anonymous complainant, stated that he felt "inspire[d]" by the anonymous complainant, drew parallels between his own experiences and the anonymous

complainant's to bolster the connection between them, offered his help and support to the anonymous complainant, and signed the email, "Your fan." *See* **Exhibit I.**

193.    Maj. Gen. Fullhart, Commandant of the Corps of Cadets, presided over the appeal for the Corps of Cadets.

194.    Like Dr. Keene, Maj. Gen. Fullhart was not a neutral decisionmaker, as he had biases and a conflict of interest.

195.    Maj. Gen. Fullhart was regularly updated by Col Alia and Ms. McCrery—who, as noted above, had conflicts of interest and were biased themselves (see ¶¶ 92–104)—on the investigation, and was involved in the investigation against the cadets of Bravo Company, including Mr. Dana, from the outset, likely causing Maj. Gen. Fullhart to form pre-conceived notions regarding the allegations against Mr. Dana, among others.

196.    Pursuant to Virginia Tech policy, as enumerated in the Hokie Handbook:

> *A hazing incident may also be an organizational activity:*
>
> *1.  The faculty advisor, or any of the executive officers of the organization, or the person charged with the administration of an orientation or pledge program is aware of the incident sufficiently in advance of its occurrence to prohibit its taking place, and takes no action to prohibit it.*
> . . .
> *3.  The incident takes place in any public area within a chapter house or public place.*
> . . .
> *5.  The incident involves or is actively or passively endorsed by a majority of the members of the organization.*
> *6.  The incident involves six or more members of the organization.*

197.    Maj. Gen. Fullhart as well as other executive officers of the Corps of Cadets were aware or should have been aware of the 2019 integration event; the 2019 integration event was held in public places; the 2019 integration event was well known throughout the Corps of Cadets and a longstanding tradition; and the 2019 integration event involved approximately 40 cadets.

198.    Maj. Gen. Fullhart was biased because any finding or admission that he was aware of or had approved or sanctioned the 2019 integration event would or should have resulted in a finding of organizational hazing,[6] which would have likely resulted in discipline against Maj. Gen. Fullhart by Virginia Tech or the loss of his position as Commandant of Cadets, especially in light of past similar incidents involving the Corps of Cadets (see ¶¶ 200–214). Thus, Maj. Gen. Fullhart had an improper motive and pecuniary interest to find individuals such as Mr. Dana responsible for the 2019 integration event as opposed to the Corps of Cadets as an organization.

199.    Taking additional time to consider the appeals—a courtesy not extended to Mr. Dana and the other accused students prior to the December 9, 2019, hearing—Dr. Keene denied Mr. Dana's appeal on January 10, 2020, and Maj. Gen. Fullhart denied Mr. Dana's appeal on January 11, 2020. *See* **Exhibits J, K.**

### Virginia Tech's Response to Prior Incidents Involving the Corps of Cadets

200.    The investigation, hearing, and outcome regarding the 2019 integration event heavily contrasts with how Virginia Tech and the Corps of Cadets considered similar allegations in the past.

201.    In October 2018, the Corps of Cadets' Foxtrot Company held a "Sophomore Integration" event similar to the 2019 integration event (hereinafter "Foxtrot incident").

202.    During the Foxtrot incident, sophomores were subject to treatment far harsher than any conduct alleged in the 2019 integration event. Among other things, sophomores were:

---

[6]    Mr. Dana contests that the 2019 integration event constituted hazing, notwithstanding Virginia Tech's contrary determination. To the extent Virginia Tech maintains that the 2019 integration event constituted hazing, the 2019 integration event constituted organizational hazing as well, rendering any decisionmaker from the Corps of Cadets' executive officers, including Maj. Gen. Fullhart, unconstitutionally biased.

a. made to eat a banana quickly and to then chug a Sprite;

b. given pieces of banana peels to eat;

c. made to eat buns that had fallen on the ground in the dirt;

d. required to engage in physical activities, or calisthenics, well beyond what was approved by Corps of Cadets' leadership;

e. covered in honey and sand and sprayed with water;

f. required to crawl through a mud puddle in cold weather;

g. verbally berated and humiliated, including with the use of racial slurs;

h. required to participate in a "fight circle," which resulted in actual injuries such as a chipped tooth; and

i. pushed while running, almost falling off of a bridge.

203. In short, the events of the Foxtrot incident constituted hazing in every sense of the word—unlike the 2019 integration event.

204. In addition, while the Foxtrot incident was being investigated, the older cadets involved in planning and/or executing the event forced or attempted to force sophomores to sign statements typed by the older cadets, prompting Virginia Tech to charge them with interfering with the conduct process.

205. Despite the severity of this conduct, no students were suspended; at most, students received deferred suspensions.

206. Furthermore, in stark contrast to the rushed nature of the investigation and hearing regarding the 2019 integration event, conduct referrals for the Foxtrot incident were served in January 2019, thereby giving the charged cadets the opportunity to finish their semester, and the hearing was continued upon request.

207.    In October 2017, the Corps of Cadets' Hotel Company organized an unauthorized training event for new cadets in the vicinity of Duck Pond (hereinafter "Duck Pond incident").

208.    The Duck Pond incident involved physical exercise training in areas of shallow water and mud.

209.    Similar to the 2019 integration event, the Duck Pond incident did not result in any injury.

210.    However, in contrast to the 2019 integration event, the six cadets found responsible for the Duck Pond incident were merely reprimanded and required to meet with Captain James S. Snyder, Deputy Commandant, for a remedial assignment.

211.    In further contrast to the 2019 integration event, the Duck Pond incident did not result in any investigation or sanction by Virginia Tech.

212.    Virginia Tech has asserted that all Student Conduct sanctions are based on extensive case precedent.

213.    The Foxtrot incident and Duck Pond incident demonstrate that this assertion is false.

214.    The Foxtrot incident and Duck Pond incident further demonstrate that the punishment imposed by Virginia Tech and the Corps of Cadets against Mr. Dana, as well as all the other accused students, was completely arbitrary and capricious.

### Mr. Dana's Injuries

215.    As a result of the Defendants' actions, Mr. Dana has suffered damages, including disruption of his educational progress; disruption of his career; embarrassment; and loss of good name.

216.    Mr. Dana had an Army scholarship and had signed a contract with the Army to commission as an officer upon graduation—the only requirement Mr. Dana has left to fulfill for his commissioning.

217.    Unless he is afforded the relief requested by this action, Mr. Dana will be forever stigmatized, and his previously stellar record will be forever impaired, by Defendants' actions.

218.    In addition, due to being found responsible for hazing and his subsequent suspension, Mr. Dana will be subjected to an Army hearing (which is currently pending), which may subject him to disenrollment, forfeiting his Army commission, and forcing to repay his scholarship upon graduation.

### COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS (AGAINST ALL DEFENDANTS)

219.    Mr. Dana reasserts and realleges the foregoing paragraphs as if fully stated herein.

220.    The Fourteenth Amendment to the United States Constitution provides: "No State . . . shall . . . deprive any person of life, liberty, or property, without due process of law."

221.    Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

222.    At the time Mr. Dana attended Virginia Tech, the university had in place a system of expelling, suspending, or dismissing students, only after a finding of cause, in accordance with its policies and procedures in the Hokie Handbook.

223.    Specifically, the Hokie Handbook provides that students such as Mr. Dana are entitled to procedural guarantees, including the following:

    a.   The student or organization will be provided with a written statement of charges sufficiently in advance of the hearing and in reasonable detail to allow the student or organization to prepare a case for the formal hearing;

    b.   Students may choose to refute or question any information or witnesses and will be given an opportunity to present a rebuttal to the charges and to produce witnesses or written statements on their own behalf;

    c.   To help them prepare their response, students or organizational representatives may choose an advisor, who may be present at the formal hearing but may not participate in the proceedings;

    d.   At a formal hearing, the student or organizational representative may challenge the objectivity of any committee member or administrator, given reasonable cause to believe that the member may be biased or have a conflict of interest;

    e.   When the outcome of a formal hearing results in suspension, dismissal or denial of athletic privileges/ housing/network access, the charged student or organization may appeal; and

    f.   Sanctions do not typically take effect until the Appellate Officer decision is final.

224.    The Hokie Handbook identifies a formal student conduct hearing as a right.

40

225.    The Hokie Handbook provides: "Behaviors that violate the Student Code of Conduct are addressed through the student conduct system. Beyond the rights and responsibilities outlined in this handbook, Virginia Tech students enjoy those rights guaranteed by the Constitutions of the United States and of the Commonwealth of Virginia."

226.    The Hokie Handbook provides: "Policies are valid for the period given. The university reserves the right to change those policies during the academic year and notification is hereby given of that possibility."

227.    At no time relevant to this Complaint did Virginia Tech change its policies regarding the student conduct system.

228.    Thus, Virginia Tech, through the specific policies and procedures set forth in its Hokie Handbook, created a reasonable expectation that Mr. Dana would not be removed from the university or deprived of his right to pursue his degree but for application of the system that Virginia Tech had enacted in student conduct matters.

229.    Accordingly, Mr. Dana had a property interest in his continued enrollment at Virginia Tech.

230.    Mr. Dana also had a property interest in his continued eligibility for the Emerging Leader Scholarship, the U.S. Army's contributions to his education which Mr. Dana may be required to repay, and his officer contract with the U.S. Army.

231.    Mr. Dana suffered a deprivation of his property interests when he was suspended for one semester from Virginia Tech and dismissed from the Corps of Cadets, which, as a result, will inhibit his ability keep his officer contract with the U.S. Army and scholarship.

232.    Mr. Dana also has a constitutionally protected liberty interest in his good name, reputation, and integrity.

41

233.    Mr. Dana suffered a deprivation of his liberty interest when he was found responsible for hazing and consequently suspended for one semester from Virginia Tech and dismissed from the Corps of Cadets, which, as a result, will inhibit his ability keep his officer contract with the U.S. Army and scholarship, and may result in the forfeiting his Army commission, constituting the loss of government employment.

234.    The due process protections of the Fourteenth Amendment to the United States Constitution apply to the disciplinary process used by Virginia Tech and the Corps of Cadets against Mr. Dana.

235.    Mr. Dana was entitled to process commensurate with the seriousness of the charge of hazing and the potential discipline he faced. The allegation was serious and resulted in harsh sanctions, as well as the prospect of a lifelong stigma that will foreclose future educational and employment opportunities.

236.    Mr. Dana was entitled to a fundamentally fair procedure to determine whether he was responsible for the alleged misconduct.

237.    Defendants failed to provide adequate procedural due process when they:

    a.   fabricated an email chain to obfuscate the nature, substance, and identity of his accuser;

    b.   failed to identify Mr. Dana's accuser;

    c.   failed to provide Mr. Dana with an opportunity to confront and question his accuser, thereby precluding Mr. Dana from soliciting any evidence regarding the anonymous complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts;

d.  failed to provide Mr. Dana all the evidence in their possession, including the original complaint, meeting notes, and other items, before the formal hearing;

e.  appointed investigators, hearing officers, and appellate officers to adjudicate Mr. Dana's charges who were not impartial as they possessed known biases and/or conflicts of interest;

f.  failed to provide Mr. Dana adequate notice of the charges again him, specifically, that he had "blood pinned" Mr. Ratcliffe; and

g.  failed to provide Mr. Dana with a reasonable opportunity to be heard because Mr. Dana was not informed in advance of the hearing that Mr. Ratcliffe would be testifying that Mr. Dana had "blood pinned" Mr. Ratcliffe.

238.  Dr. Shushok intentionally violated Mr. Dana's procedural due process rights in that he conspired to obfuscate the origins of the allegations against Mr. Dana and his fellow accused students, for the purpose of preventing Mr. Dana from knowing the identity and cross-examining the anonymous complainant. This act had the effect of precluding Mr. Dana from soliciting favorable testimony regarding the anonymous complainant's knowledge (or lack thereof), credibility, biases, conflicts of interest, and other relevant facts. Dr. Shushok thus intentionally disregarded Mr. Dana's rights as a student accused of misconduct.

239.  Dr. Keene intentionally violated Mr. Dana's procedural due process rights in the same vein as Dr. Shushok (see ¶ 238). Additionally, Dr. Keene intentionally violated Mr. Dana's procedural due process rights in adjudicating Mr. Dana's appeal and upholding the sanctions imposed against him, when:

a.  Mr. Dana lacked the opportunity to confront and question his accuser, thereby precluding Mr. Dana from soliciting any evidence regarding the anonymous

complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts;

b.   The investigation report which formed the basis for the allegations against Mr. Dana was compiled by investigators with known biases and conflicts of interest;

c.   Mr. Dana did not have all the evidence in Virginia Tech and the Corps of Cadets' possession, including the original complaint, meeting notes, and other items, before the formal hearing and appeal;

d.   Mr. Dana was not provided with adequate notice of the charges again him, specifically, that he had "blood pinned" Mr. Ratcliffe;

e.   Mr. Dana was not provided with a reasonable opportunity to be heard, because Mr. Dana was not informed in advance of the hearing that Mr. Ratcliffe would be testifying that Mr. Dana had "blood pinned" Mr. Ratcliffe; and

f.   Dr. Keene was not an impartial decisionmaker, for the reasons stated in paragraphs 189–191 of this Complaint.

240.   Because Dr. Shushok had administrative authority and responsibility for Student Conduct policies and procedures, and because Dr. Shushok appointed Dr. Keene to adjudicate Mr. Dana's appeal, Dr. Shushok is responsible for Dr. Keene's procedural due process violations.

241.   Mr. Schuh intentionally violated Mr. Dana's procedural due process rights in finding Mr. Dana responsible and imposing sanctions against him, when:

a.   Mr. Dana lacked the opportunity to confront and question his accuser, thereby precluding Mr. Dana from soliciting any evidence regarding the anonymous

complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts;

b.  The investigation report which formed the basis for the allegations against Mr. Dana was compiled by investigators with known biases and conflicts of interest;

c.  Mr. Dana did not have all the evidence in Virginia Tech and the Corps of Cadets' possession, including the original complaint, meeting notes, and other items, before the formal hearing and appeal;

d.  Mr. Dana was not provided with adequate notice of the charges again him, specifically, that he had "blood pinned" Mr. Ratcliffe; and

e.  Mr. Dana was not provided with a reasonable opportunity to be heard, because Mr. Dana was not informed in advance of the hearing that Mr. Ratcliffe would be testifying that Mr. Dana had "blood pinned" Mr. Ratcliffe.

242.  Defendant Col. Russell intentionally violated Mr. Dana's procedural due process rights in finding Mr. Dana responsible and imposing sanctions against him, when:

a.  Mr. Dana lacked the opportunity to confront and question his accuser, thereby precluding Mr. Dana from soliciting any evidence regarding the anonymous complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts;

b.  The investigation report which formed the basis for the allegations against Mr. Dana was compiled by investigators with known biases and conflicts of interest;

c.  Mr. Dana did not have all the evidence in Virginia Tech and the Corps of Cadets' possession, including the original complaint, meeting notes, and other items, before the formal hearing and appeal; and

    d.  Mr. Dana was not provided with adequate notice of the charges again him, specifically, that he had "blood pinned" Mr. Ratcliffe;

    e.  Mr. Dana was not provided with a reasonable opportunity to be heard, because Mr. Dana was not informed in advance of the hearing that Mr. Ratcliffe would be testifying that Mr. Dana had "blood pinned" Mr. Ratcliffe; and

    f.  Col. Russell was not an impartial decisionmaker, for the reasons stated in paragraph 161 of this Complaint.

243.    Defendant Maj. Gen. Fullhart intentionally violated Mr. Dana's procedural due process rights in adjudicating Mr. Dana's appeal and upholding the sanctions imposed against him, when:

    a.  Mr. Dana lacked the opportunity to confront and question his accuser, thereby precluding Mr. Dana from soliciting any evidence regarding the anonymous complainant's knowledge, credibility, biases, conflicts of interest, and other relevant facts;

    b.  The investigation report which formed the basis for the allegations against Mr. Dana was compiled by investigators with known biases and conflicts of interest;

    c.  Mr. Dana did not have all the evidence in Virginia Tech and the Corps of Cadets' possession, including the original complaint, meeting notes, and other items, before the formal hearing and appeal;

    d.  Mr. Dana was not provided with adequate notice of the charges again him, specifically, that he had "blood pinned" Mr. Ratcliffe;

    e.    Mr. Dana was not provided with a reasonable opportunity to be heard, because Mr. Dana was not informed in advance of the hearing that Mr. Ratcliffe would be testifying that Mr. Dana had "blood pinned" Mr. Ratcliffe; and

    f.    Maj. Gen. Fullhart was not an impartial decisionmaker, for the reasons stated in paragraphs 193–198 of this Complaint.

244.    As a result of these due process violations, Mr. Dana was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his Army commission and incurring a repayment debt of his scholarship. Furthermore, as a consequence of Defendants' actions, Mr. Dana's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

## COUNT II – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS (AGAINST ALL DEFENDANTS)

245.    Mr. Dana reasserts and realleges the foregoing paragraphs as if fully stated herein.

246.    The Fourteenth Amendment to the United States Constitution provides: "No State . . . shall . . . deprive any person of life, liberty, or property, without due process of law."

247.    Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer

for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

248.    Separate and apart from the fairness of the procedures utilized, the Fourteenth Amendment to the United States Constitution also protects Mr. Dana's property interests under substantive due process from government intrusion which is arbitrary and capricious.

249.    Virginia Tech has a long history of permitting students in the Corps of Cadets to conduct integration events that include physical training exercises and optional pinning. Indeed, there was even a photograph hanging in the Corps of Cadets hall documenting such an event the previous year.

250.    In November 2019, Virginia Tech received notice from counsel for an accused student of hazing in other companies. But, Virginia Tech declined to investigate or bring sanctions against anyone else, other than Mr. Dana and the members of Bravo Company.

251.    In October 2018, Virginia Tech responded to the severe hazing conduct of the Foxtrot Company (see ¶¶ 201–204) by imposing sanctions far less serious than those imposed against Mr. Dana and the other accused students in Bravo Company. No Foxtrot Company students were suspended; at most, they received deferred suspensions.

252.    In October 2017, six student leaders in the Corps of Cadets' Hotel Company were found responsible for hazing new cadets with physical exercise in the Duck Pond incident (see ¶¶ 207–211), but Virginia Tech did not even investigate this incident, let alone impose sanctions, despite the sophomore students participating in the 2019 integration event suffering injuries no more severe than those suffered by the sophomores the Duck Pond incident.

253.    The failure to investigate other allegations and impose less severe sanctions for more severe conduct demonstrates that the Defendants were not interested in holding

48

accountable everyone who engaged in such an act equally, but rather in casting blame on a few cadets to answer a specific complaint.

254.    Most importantly, no one, other than the anonymous, unnamed, unidentified complainant, seems to suggest Mr. Dana and others committed hazing. The overwhelming weight of evidence suggests that the event was safe, voluntary, and optional.

255.    Defendants found Mr. Dana responsible for hazing because he purportedly "blood pinned" another cadet, which was defined by Virginia Tech and the Corps of Cadets as "putting a pin onto an individual's chest and then physically hitting or pushing the exposed pins into the individual's skin to the point of drawing blood."

256.    Yet, significantly, there was no evidence whatsoever that any sophomore participating in the 2019 integration event had their blood drawn as a result of any pinning performed upon them, and certainly not by any pinning performed by Mr. Dana.

257.    Accordingly, it was arbitrary and capricious for Defendants to punish Mr. Dana for hazing, when the facts do not support it, the same conduct had been tolerated in the past, and other conduct has gone uninvestigated.

258.    As a result of the substantive due process violations, Mr. Dana was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his Army commission and incurring a repayment debt of his scholarship. Furthermore, as a consequence of Defendants' actions, Mr. Dana's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

## COUNT III – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)

259. Mr. Dana reasserts and realleges the foregoing paragraphs as if fully stated herein.

260. The Fourteenth Amendment to the United States Constitution provides: "No State . . . shall . . . deny to any person within its jurisdiction the equal protection of the laws."

261. Pursuant to 42 U.S.C. § 1983: "Every person who, under color and authority of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

262. Under the Fourteenth Amendment to the United States Constitution, all persons similarly situated must be treated alike. Thus, if a class of persons similarly situated to another class have been treated disparately, the Fourteenth Amendment has been violated.

263. Mr. Dana and the other accused students in Bravo Company were in all relevant respects similarly situated to the cadets in Foxtrot Company who were charged with hazing due to the Foxtrot incident (see ¶¶ 201–204).

264. However, Mr. Dana and the other accused students in Bravo Company were treated disparately compared to Virginia Tech's treatment of the Foxtrot Company cadets.

265. Specifically, Virginia Tech imposed sanctions far less serious than those imposed against Mr. Dana and the other accused students in Bravo Company, for conduct that was

objectively more severe than the conduct alleged to have been committed by Mr. Dana and the other accused students in Bravo Company. No Foxtrot Company students were suspended; at most, they received deferred suspensions.

266.    As a result of this violation of the equal protection clause, Mr. Dana was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has incurred attorneys' fees, lost his Virginia Tech Emerging Leaders scholarship, and is at jeopardy of losing his Army commission and incurring a repayment debt of his scholarship. Furthermore, as a consequent of Defendants' actions, Mr. Dana's military career is in jeopardy, and his chances for promotions and positions within the military will be adversely affected.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Dana requests the Court award the following relief, and enter a judgment against the Defendants, jointly and severally:

a.    A declaratory judgment that the Defendants violated Mr. Dana's constitutional rights to due process;

b.    A preliminary injunction requiring the Defendants to lift Mr. Dana's suspension and remove the misconduct finding from his record at Virginia Tech and the Corps of Cadets;

c.    A permanent injunction requiring the Defendants to lift Mr. Dana's suspension, remove the misconduct finding from his record, expunge Mr. Dana's records at Virginia Tech and the Corps of Cadets of any indication of a finding that he committed an act of hazing or was the subject of discipline with respect to the incidents described in this Complaint;

c.    A permanent injunction enjoining Defendants from: (i) continuing to enforce any sanction against Mr. Dana for alleged hazing with respect to the incidents described in this Complaint; (ii) making any notation in Mr. Dana's educational or disciplinary records with

respect to the incidents described in this Complaint; and, (iii) making any disclosure to a third party that any adverse disciplinary action was taken against Mr. Dana arising out of the incidents described in this Complaint;

      d.     An award of Mr. Dana's attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and any other appropriate authority;

      e.     An award of compensatory damages in an amount to be determined at trial against Defendants Frank Shushok, Jr., Frances B. Keene, Ph.D, Steve Schuh, Lt. Col. Donald G. Russell, and Maj. Gen. Randal D. Fullhart, in their respective individual capacities;

      f.     An award of punitive damages in an amount to be determined at trial against Defendants Frank Shushok, Jr., Frances B. Keene, Ph.D, Steve Schuh, Lt. Col. Donald G. Russell, and Maj. Gen. Randal D. Fullhart, in their respective individual capacities; and

      g.     Any other further relief as the Court deems just and appropriate.

**TRIAL BY JURY DEMANDED ON ALL TRIABLE ISSUES**

                                 Respectfully submitted,

                                 CHRISTOPHER J. DANA

                               By:  /s/Daniel J. Martin
                                    Of Counsel

John P. Fishwick, Jr., Esquire (VSB #23285)
John.Fishwick@fishwickandassociates.com
Carrol M. Ching, Esquire (VSB # 68031)
Carrol.Ching@fishwickandassociates.com
Daniel J. Martin, Esquire (VSB #92387)
Daniel.Martin@fishwickandassociates.com
Fishwick & Associates PLC
30 Franklin Road SW, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 Telephone
(540) 345-5789 Facsimile
*Counsel for Plaintiff*